IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| EUGENE WALDEN, III, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:21-CV-304 (MTT) |
| ) | |
| GINA M. RAIMONDO, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**ORDER**

Defendant Gina M. Raimondo, Secretary of the United States Department of Commerce ("DOC"), moves for summary judgment on pro se plaintiff Eugene Walden, III's disparate impact claim—his only remaining claim. Doc. 68. For the following reasons, Raimondo's motion (Doc. 68) is **GRANTED**.

**I. BACKGROUND**[1]

On December 24, 2009, Walden, a Black male, applied to work for the 2010 Decennial Census. Doc. 68-2 ¶¶ 22-23. "The United States Census Bureau ('the

---

[1] Unless otherwise stated, these facts are undisputed and are from Raimondo's statement of facts. Cognizant of Walden's pro se status, following Raimondo's motion for summary judgment, the Court advised Walden of his duty to respond to the motion, including the admonitions that he could not rely on the pleadings but instead must present evidence to establish a genuine issue of material fact and must provide his own statement of material facts and respond to Raimondo's statement of facts. Doc. 69. Despite this notice, Walden failed to respond. Because he failed to respond, the motion is unopposed and the facts in Raimondo's statement are therefore deemed admitted. M.D. Ga. L.R. 56. However, the Court further confirmed that the facts were supported by the record by "review[ing] all of the evidentiary materials submitted in support of" Raimondo's motion, as well as evidentiary material previously submitted by Walden. *United States v. One Piece of Real Prop'y*, 363 F.3d 1099, 1101-02 (11th Cir. 2004); *Reese v. Herbert*, 527 F.3d 1253, 1269-70 (11th Cir. 2008). Moreover, despite Walden's failure to respond, because Walden is proceeding pro se and because summary judgment would lead to adverse judgment, the Court has fully analyzed Raimondo's arguments regardless of Walden's failure to respond. *One Piece of Real Prop'y*, 363 F.3d at 1101. Therefore, if evidence in the record shows that a fact is disputed, the Court draws all justifiable inferences in Walden's favor for purposes of summary judgment.

Bureau') conducts the Decennial Census" and is part of the DOC. *Id*. ¶¶ 1, 9. The DOC's Census Hiring and Employment Check ("CHEC") Staff "ran an initial 'Name Check' against FBI criminal history index" and "determined that there were criminal history records possibly matching" Walden. *Id*. ¶¶ 7, 9, 24-25. Accordingly, CHEC sent Walden a letter he received around December 29, 2009,

> [(1)] notifying him that … the pre-appointment name check "resulted in a tentative match between [Walden] and an arrest record in the FBI criminal history index;" (2) seeking information from [Walden] regarding whether the records were actually connected to him or if the name check was inaccurate; and (3) allowing [Walden] to provide records and an explanation of the disposition of arrest records.

*Id*. ¶¶ 25-26. Walden sent the relevant documentation on January 20, 2010. *Id*. ¶ 27. It is unclear what arrest record this initial check discovered. *See* Doc. 68-4 at 6:9-8:6.

"On January 25, 2010, [Walden] was charged with having committed the offenses of Cruelty to Children in the Third Degree and Simple Battery, in Jones County, Georgia" based on him allegedly "attack[ing] … his step-son by snatching him up and throwing him to [the] ground." *Id*. ¶¶ 32, 34.

Before it was made aware of Walden's January 25, 2010 charges, on March 4, 2010, "CHEC determined that [Walden] was 'available for hire'" and on April 1, 2010, Walden "was 'selected' for training as an enumerator." *Id*. ¶¶ 28-31. Census enumerators are temporary employees who "prepare and verify address lists" and "visit private citizens at their homes and conduct interviews." *Id*. ¶¶ 3-4.

Walden started enumerator training on April 27, 2010. *Id*. ¶ 35. On April 30, 2010, the last day of training, he completed a now-destroyed Optional Form 306 ("OF-306") that asked: "Are you now under charges for any violation of law? If 'YES,' use item 16 to provide the date, explanation of the violation, place of occurrence, and the

name and address of the police department or court involved." *Id*. ¶¶ 36, 40, 43, 46. Walden answered "yes," attached his arrest warrants, and "took [his] best guess on what the charges were" in filling out item 16, but "never explained the underlying conduct on the OF-306 form." *Id*. ¶¶ 39, 41-42. He submitted required fingerprints with his OF-306 form and was hired. *Id*. ¶¶ 44-46.

CHEC received Walden's OF-306 form and fingerprints the same day, April 30, 2010. *Id*. ¶ 47. Walden's "submission of the OF-306 was the first time CHEC and the Bureau became aware of Walden's January 25, 2010 arrest."[2] *Id*. ¶ 37. CHEC sent two letters to Walden dated April 30, 2010. *Id*. ¶ 49. "The first letter informed [Walden] that he was put on 'non-working status' because '[e]ither the fingerprint check resulted in a positive match between [his] fingerprints and an arrest record in the FBI criminal history index, or information disclosed on the OF 306 needs further review.'" *Id*. ¶ 50 (alterations in original). The first letter also stated:

> Please be advised that the Census Bureau does not terminate employees based solely on having an arrest record. However, Decennial census employees represent the Census Bureau and the government and in that capacity, will be invited into private homes and communities for the purpose of collecting information. The Census Bureau must ensure that these employees do not pose a risk to the mission of the Census Bureau and, most importantly, the residents of those communities. The Bureau therefore must investigate any information that comes into its possession that would potentially indicate that one of its employees poses a risk to the residents or its mission.

*Id*. ¶¶ 51-52. The review was completed in about two and a half hours, the Bureau determined he was a risk, and the Bureau sent Walden the second letter, stating:

> We have reviewed your fingerprint record from the FBI criminal history database, as well as the past criminal history information disclosed on the Optional Form (OF) 306 you completed at hire. Based on the nature of

---

[2] Walden's charges were still pending at this time. *See* Doc. 68-12 at 3 (Walden pleading not guilty on July 22, 2010).

> the facts disclosed, we were not able to make a favorable determination regarding your continued employment. Your employment with the Census Bureau is terminated effective immediately.

*Id*. ¶¶ 47, 53-54. Walden "worked as an enumerator on May 3 and 4, 2010." *Id*. ¶ 48. He received the two April 30, 2010 letters on May 4, 2010. *Id*. ¶ 49.

On May 24, 2010, Walden filed an Equal Employment Opportunity Commission ("EEOC") complaint against the DOC based on his termination. Docs. 46-2; 68-16 at 1. His complaint "was held in abeyance as part of a class action" of which he had opted out. Doc. 68-16 at 1. After an investigation and a hearing, the Administrative Judge issued a bench decision in the DOC's favor on May 6, 2021. Doc. 68-16. Walden received his right to sue letter on May 25, 2021. Doc. 23-1. He filed suit against Raimondo on August 20, 2021, alleging Title VII of the Civil Rights Act of 1964 disparate treatment and disparate impact claims. Doc. 1. After various amendments to his complaint and two motions to dismiss, only Walden's disparate impact claim remains. Docs. 23; 24; 31; 40; 46; 53; 62. Raimondo now moves for summary judgment. Doc. 68. As noted, Walden failed to respond.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant

may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id*. at 1438 (quoting *Celotex*, 477 U.S. at 324) (alterations in original).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id*.

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."  *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id*. (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), "the court may … consider the fact undisputed for purposes of the motion[.]"  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge …

[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

District courts "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *One Piece of Real Prop'y*, 363 F.3d at 1101. In considering the merits of a motion for summary judgment, even an unopposed motion, district courts must "review all of the evidentiary materials submitted in support of the motion for summary judgment." *Id.* at 1101-02. In other words, the Court cannot simply accept the facts stated in a moving party's statement of material facts as true. *Id.* Rather, "the district court must … review the record and determine if there is, indeed, no genuine issue of material fact." *Id.* at 1103 n.6. If the review of the record "indicates a disputed issue of material fact, summary judgment [cannot] be granted." *Id*.

### III. DISCUSSION

Title VII's federal sector provision[3] provides, in part: "All personnel actions affecting employees or applicants for employment … in executive agencies …  shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Title VII's "disparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group."[4] *E.E.O.C. v. Joe's Stone*

---

[3] Raimondo incorrectly cites Title VII's private sector provision. Doc. 68-1 at 9.

[4] The Court raised the issue of whether Title VII's federal sector provision encompasses a disparate impact claim in its order on Raimondo's second motion to dismiss. Doc. 62 at 10 n.6. Raimondo did not address this issue in her motion for summary judgment. *See generally* Doc. 68. The law is not settled, but the apparent consensus among courts is that a disparate impact claim is cognizable under Title VII's federal sector provision. *Coopersmith v. Roudebush*, 517 F.2d 818, 821 n.7 (D.C. Cir. 1975); *Rodriguez v. United States*, 852 F.3d 67, 77 (1st Cir. 2017) ("It is undisputed that the 1972 amendment made the prohibition on disparate impact discrimination applicable to federal employers."); *Pacheco v. Mineta*, 448

*Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (emphasis in original); 42 U.S.C. § 2000e-2(k).

Raimondo argues she is entitled to summary judgment because Walden "cannot make out" a prima facie case of disparate impact and, even if he could, she "has established that [the DOC's] background check process is job-related and consistent with business necessity." Doc. 68-1 at 8. The Court agrees.

## A. Walden has Failed to Prove a Prima Facie Case of Title VII Disparate Impact

To establish a prima facie case of disparate impact under Title VII, a plaintiff must show: (1) "statistical evidence showing that an employment practice has the effect of denying the members of one race equal access to employment opportunities," (2) "a specific, facially-neutral, employment practice which is the alleged cause of the disparity," and (3) "a causal nexus … between the specific employment practice and the statistical disparity shown." 42 U.S.C. § 2000e-2(k*); Watson v. Fort Worth Bank & Tr.*,

---

F.3d 783, 787 (5th Cir. 2006) ("Title VII creates a federal cause of action for two largely separate theories of discrimination, disparate treatment and disparate impact."); *see Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) (holding, prior to the enactment of Title VII's federal sector provision, that Title VII includes a disparate impact claim); S. Rep. No. 92-415, at 16 (1971) ("[T]he committee found that an aggrieved Federal employee does not have access to the courts. … The provisions adopted by the committee will enable the Commission to grant full relief to aggrieved employees, or applicants. … Aggrieved employees or applicants will also have the full rights available in the courts as are granted to individuals in the private sector under Title VII."); *Morton v. Mancari*, 417 U.S. 535, 547 (1974) ("In general, it may be said that the substantive anti-discrimination law embraced in Title VII was carried over and applied to the Federal Government."); *Chandler v. Roudebush*, 425 U.S. 840 (1976) (quoting Senate Report No. 92-415 and recognizing Congress's intent to carry over the same Title VII private-sector safeguards to the federal sector); *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 533 (2015) (holding that "antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors," i.e., the inclusion of language similar to "adversely affect his status as an employee"); 42 U.S.C. § 2000e-16(a) (emphasis added) ("All personnel actions *affecting* employees or applicants for employment … in executive agencies … shall be made free from any discrimination based on race, color, religion, sex, or national origin."); *Muldrow v. Garland*, 2022 WL 3716850, at *4-5 (M.D. Fla. Aug. 29, 2022) (evaluating disparate impact claim against United States Attorney General); *but see* 42 U.S.C. § 2000e-2(k) (provision regarding disparate impact burden of proof added to Title VII's private sector provision in 1991, but not to the federal sector provision). Accordingly, the Court presumes for the purposes of this Order that a disparate impact claim is cognizable under Title VII's federal sector provision and applies the law governing private sector disparate impact claims.

487 U.S. 977, 995 (1988) (quoting *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 584 (1979)); *Joe's Stone Crab, Inc.*, 220 F.3d at 1274; *Woods v. Lockheed Martin Corp.*, 2022 WL 2972852, at *3 (11th Cir. July 27, 2022).  Because Walden failed to respond, he has necessarily failed to carry his burden of proving his prima facie case—he did not provide statistical evidence of a disparity or state the specific, facially-neutral, employment practice that caused the disparity.[5]  *Watson*, 487 U.S. at 994; *Joe's Stone Crab, Inc.*, 220 F.3d at 1274-75.  The Court's analysis could stop there, but it continues.

Raimondo points to 2010 data of the racial composition of Bibb County's population, Jones County's population, and the Macon Local Census Office ("Macon LCO"), contending it proves "that no disparity existed between the racial composition of the applicant pool and that of the employees hired by the Bureau for 2010 Census jobs in the Macon area."  Docs. 68-1 at 11; 68-6; 68-7; 68-8.  This data shows that in 2010, 48.66% of Bibb and Jones Counties' combined population was Black and 51.87% of Macon LCO employees were Black.  Docs. 68-6 (789 out of 1,521 Macon LCO employees); 68-7 (82,471 out of the 155,547 Bibb County population); 68-8 (7,169 out of the 28,669 Jones County population).  Thus, as stated by Raimondo, "a higher percentage of Black or African American-identifying individuals were hired in the Macon LCO for the 2010 Census cycle (51.87%) than their share in the general population of Bibb and Jones Counties at that time (48.66%)."  Doc. 68-1 at 12.  Although this data fails to consider the populations of other possibly relevant counties, i.e., Crawford, Monroe, and Twiggs, is not constrained to applicants, and does not distinguish between qualified and unqualified individuals, it is compelling and suggests no statistical

---

[5] The Court presumes that the employment practice at issue is the Bureau's policy of excluding individuals from employment based on criminal history.  Docs. 53 ¶¶ 73-75; 68-1 at 12-13.

disparity. *See Peightal v. Metro. Dade Cnty.*, 26 F.3d 1545, 1554 (11th Cir. 1994) ("[F]or positions requiring minimal training or for certain entry level positions, statistical comparison to the racial composition of the relevant population suffices, whereas positions requiring special skills necessitate a determination of the number of minorities qualified to undertake the particular task."); *but see Joe's Stone Crab, Inc.*, 220 F.3d at 1275 (emphasis in original) ("[I]t is critical to observe that no statistically-significant disparity exists between the percentage of women who actually *applied* to [the defendant] and the percentage of women who were *hired* … by [the defendant]."), 1277 n.13.

Accordingly, Walden has failed to establish a prima facie case of Title VII disparate impact and the Court cannot conclude that there was a causal nexus between the Bureau's policy of excluding individuals from employment based on criminal history and any statistical disparity, and Raimondo is entitled to summary judgment.

**B. Raimondo has Shown that the Policy is Required by Business Necessity**

Even if Walden could prove his prima facie case, Raimondo has carried her burden of proving her business necessity defense. 42 U.S.C. § 2000e-2(k)(1)(A)(i).

"[N]ot all employment practices causing a disparate impact impose liability" under Title VII. *Tex. Dep't of Hous. & Cmty. Affairs*, 576 U.S. at 531; *Griggs*, 401 U.S. at 431. Thus, a defendant may defeat a disparate impact claim if she can "establish that the challenged employment practice serves a legitimate, non-discriminatory business objective," i.e., prove a business necessity defense. *Joe's Stone Crab, Inc.*, 220 F.3d at 1275; *In re Emp. Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1314 (11th Cir. 1999).

Although no Eleventh Circuit or Supreme Court case specifically addresses an employer's consideration of criminal history in the context of the business necessity defense, Supreme Court precedent, out-of-circuit case law, and EEOC guidance is instructive.  In a Title VII disparate impact case concerning height and weight requirements for correctional officers, the Supreme Court noted, "a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977).  The Supreme Court in that case rejected the defendant's business necessity defense because the defendant failed to "correlat[e] the height and weight requirements with the requisite amount of strength thought essential to good job performance" or "offer evidence of any kind in specific justification of the … standards." *Id*. at 331.

In *Green v. Missouri Pacific Railroad Company*, the Eighth Circuit addressed a Title VII disparate impact claim involving a black employee who was denied employment based on a conviction for refusing military induction because the employer had a "policy of disqualifying for employment any applicant with a conviction for any crime other than a minor traffic offense."  523 F.2d 1290, 1292-93 (8th Cir. 1975).  The Eighth Circuit, after holding the policy was discriminatory and remanding the case, affirmed the district court's injunction requiring the consideration of three factors prior to denying an applicant based on his or her criminal record: (1) "the nature and gravity of the offense or offenses," (2) "the time that has passed since the conviction and/or completion of sentence," and (3) "the nature of the job for which the applicant has applied."  *Green v. Mo. Pac. R.R. Co.*, 549 F.2d 1158, 1160 (8th Cir. 1977).

The EEOC's federal employment guidance[6] regarding the consideration of criminal records cites the Office of Personnel Management's criteria, noting their "consisten[ce] with the three *Green* factors"[7]:

> (1) the nature of the position for which the person is applying or in which the person is employed; (2) the nature and seriousness of the conduct; (3) the circumstances surrounding the conduct; (4) the recency of the conduct; (5) the age of the person involved at the time of the conduct; (6) contributing societal conditions; and (7) the absence or presence of rehabilitation or efforts toward rehabilitation.[8]

Finally, in *El v. Southeastern Pennsylvania Transportation Authority (SEPTA)*, the Third Circuit directly addressed the issue, citing *Dothard*, *Green*, and the EEOC guidance.  479 F.3d 232 (3d Cir. 2007).  In *El*, the employer, hired by a state agency to provide transportation for disabled individuals, was prohibited by the state from hiring paratransit drivers with convictions, including convictions for DUIs and violent offenses.  479 F.3d at 235-36.  The plaintiff worked for two weeks as a driver before he was

---

[6] "[A]lthough administrative interpretations of an Act by its enforcing agency are not controlling, they 'do constitute a body of experience and informed judgment to which [courts] may properly resort for guidance.'"  *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1214 (11th Cir. 2010) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  The Supreme Court has held, however, that "the EEOC's … guidance's special power to persuade" can be limited where its "thoroughness," "validity of its reasoning," and "consistency with earlier and later pronouncements" weigh against its reliability.  *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 225 (2015); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority.").  Nothing suggests the EEOC's guidance relevant here should be limited—it thoroughly examines relevant case law, its guidance is consistent with that case law, and its guidance has remained unchanged since 1990.  EEOC, *Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act*, 1990 WL 1104708, at *4 (Sept. 7, 1990).

[7] The EEOC adopted the "*Green* factors" in its guidance regarding private employment.  EEOC, *Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act*, No. 915.002, § VI(B)(1) & (6), https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions (Apr. 25, 2012).  Raimondo, again, ignores the federal employment aspect of this case and relies solely on the guidance relevant to private employment.  Doc. 68-1 at 15.

[8] EEOC, *Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act*, No. 915.002, § VI(E), https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions (Apr. 25, 2012).

terminated after the employer discovered his 40-year-old second-degree murder conviction. *Id*. at 235. He sued the state agency, alleging the criminal history policy had a disparate impact on African Americans and Hispanics, in violation of Title VII. *Id*. at 236-37. The district court held that the policy was justified by business necessity. *Id*. at 237. The Third Circuit, evaluating the "*Green* factors," agreed, and held that Title VII "require[s] that the policy under review accurately distinguish between applicants that pose an unacceptable level of risk and those that do not," and "[i]f a bright-line policy can distinguish between individual applicants that do and do not pose an unacceptable level of risk, then such a policy is consistent with business necessity." *Id*. at 245.

Relying on the above authority, Raimondo argues the Bureau's policy of excluding individuals from employment based on criminal history meets the standard for business necessity. She is correct. First, the Bureau's policy serves a legitimate, non-discriminatory business objective—to ensure it employs individuals who are trustworthy and safe so that the public is not harmed and the Census's goal to obtain accurate data is not thwarted. The Bureau is unwavering in this objective. In its March 4, 2010 letter to Walden, the Bureau stated: "[B]ecause Census Bureau workers are in direct contact with the public, it is necessary to take extra measures to ensure that these employees are competent, dependable, and honest." Doc. 30-12. In its April 30, 2010 letter to Walden after receipt of his fingerprints and OF-306, the Bureau stated:

> Decennial census employees represent the Census Bureau and the government and, in that capacity, will be invited into private homes and communities for the purpose of collecting information. The Census Bureau must ensure that these employees do not pose a risk to the mission of the Census Bureau and, most importantly, the residents of those communities.

Doc. 30-13.  And in a 2018 letter to the Office of Inspector General in response to a draft report created in preparation for the 2020 Census, the Bureau noted the same significance:

> The objective of Census' background check program is in large part to ensure the safety of the millions of people in the United States who will be visited by or personally engage with a Census Bureau employee or temporary employee in 2020.  The public's safety is paramount to the Census Bureau and is critical to the successful performance of our census operations including, but not limited to, the 2020 Decennial.  In order to be fully successful in our mission to count every person in the United States once, only once, and in the right place, people must trust the Census employees and contractors who ask them for personal information.  The Census Bureau therefore takes very seriously its obligation to ensure that the people it hires, *especially those who conduct on-the-ground household surveys*, do not represent a danger to any individual or community.  The Census Bureau understands that a strong background check program is key to achieving this goal, and we appreciate the OIG's continued attention to it.

Doc. 68-5 at 22 (emphasis added).  The enumerator position Walden held is one that required "on-the-ground household surveys."  *Id*.  Census enumerators "prepared and verified address lists and visited addresses in person, and later interviewed households that did not return the census questionnaire that was mailed to them."  Doc. 68-3 at 15.

Second, the Bureau did not have a "bright line" policy of excluding from employment any individual with a criminal record.  When Walden completed the initial background check, the Bureau asked Walden to provide records and an explanation before it investigated and determined he was "available for hire."  Docs. 30-12; 68-2 ¶¶ 24-28.  This process is further illustrated by the Bureau's April 30, 2010 letters to Walden after it received his fingerprints and OF-306 form:

> Either the fingerprint check resulted in a positive match between your fingerprints and an arrest record in the FBI criminal history index, or information disclosed on the OF 306 *needs further review*.  We have placed you in non-working status until the Census Hiring and Employment

>Check (CHEC) staff can make a final determination.  We have notified your local Census office of this decision.  You may be contacted to provide additional documentation regarding these arrests.
>
>*Please be advised that the Census Bureau does not terminate employees based solely on having an arrest record …. The Bureau therefore must investigate any information that comes into its possession that would potentially indicate that one of its employees poses a risk to the residents or its mission*.
>
>…
>
>We have reviewed your fingerprint record from the FBI criminal history database, as well as the past criminal history information disclosed on the Optional Form (OF) 306 you completed at hire.  Based on the nature of the facts disclosed, we were not able to make a favorable determination regarding your continued employment.  Your employment with the Census Bureau is terminated effective immediately.

Docs. 30-13 (emphasis added); 30-14; *see also* Doc. 68-9 (two and a half hours between notification of the criminal record and the Bureau's decision).  A CHEC employee's testimony from Walden's EEOC hearing confirms this investigation process.  Doc. 68-4 at 63:5-73:17.  In sum, once the Bureau received notification of an individual's criminal record, it did not automatically exclude him or her.  Rather, it reviewed the individual's record and investigated the risk.

Finally, the *Green* factors support a finding of business necessity. The enumerator position requires individuals to interview residents, enter their homes, and record accurate information.  An individual's criminal history is relevant to show whether they can be trusted to safely and honestly perform these tasks.  Moreover, Walden was charged with cruelty to children and simple battery three months prior to beginning his position—violent offenses close in time to his employment.

For these reasons, the Court concludes that Raimondo has carried her burden of proving her business necessity defense and, by virtue of Walden's failure to respond, he

cannot "still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *Joe's Stone Crab, Inc.*, 220 F.3d at 1275.

### IV. CONCLUSION

Accordingly, Raimondo's motion for summary judgment (Doc. 68) is **GRANTED**. Walden's disparate impact claim is dismissed with prejudice.[9]

**SO ORDERED**, this 2nd day of August, 2024.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[9] Walden's motion for "leave to supplement initial disclosures" (Doc. 66) is **TERMINATED as moot**.